David A. YURKEW, Sr., Plaintiff,

v.

James SINCLAIR, Individually and as Space Rental Superintendent of the Minnesota State Fair, William Korff, Michael Heffron, Norris Carnes, Lawrence Haeg, William Lilliquist, Sulo Ojakangas, Eileen Roehlke, Logan Scow, Arthur Springler, J. Tiffany, Individually and members of the Board of Managers of the Minnesota State Fair, and the Minnesota State Agricultural Society, Defendants.

Civ. No. 4-80-239.

United States District Court,
D. Minnesota,
Fourth Division.

July 31, 1980.

Laurie Savran and Barbara H. Nevin, Minneapolis, Minn., for plaintiff.

Jonathan Adams, Minneapolis, Minn., and Linda M. Ojala (of counsel), Minneapolis, Minn., for amicus curiae Minnesota Civil Liberties Union.

Warren Spannaus, Atty. Gen., and William P. Marshall, Sp. Asst. Atty. Gen., St. Paul, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This is an action brought by plaintiff David Yurkew, Sr., a commercial tattooist, pursuant to 42 U.S.C. § 1983,[1] which challenges the refusal of the Minnesota State Fair Board of Managers to rent plaintiff space for commercial tattooing at the 1978, 1979 and 1980 state fairs. The plaintiff's sole contention is that the decision of the State Fair's Board of Managers violates his First Amendment rights, as applied to the states by the Fourteenth Amendment. Basically, plaintiff contends that he is an artist, that tattoo is an art form, that the process of creating a tattoo is protected First Amendment activity, that the State Fair is a public forum for purposes of the First Amendment, and that the defendants' refusal to rent him space at the fair amounts to an unlawful and unconstitutional prior restraint. The defendants dispute the notion that the process of tattooing is protected by the First Amendment, and argue alternatively that the interests of the State in protecting the health of fair patrons, as well as the protection of consumers, justify the exclusion of tattooing from the fair. Minnesota has not prohibited the practice of tattooing, and has left the subject of regulation or prohibition of the practice to local governments.

---

1. 42 U.S.C. § 1983 provides:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

This action seeks both injunctive relief insofar as the 1980 state fair is concerned, and damages for the refusal of defendants to allow plaintiff to rent space at the 1978 and 1979 Minnesota State Fair. The plaintiff initially moved for a preliminary injunction to compel defendants to provide space to plaintiff for the 1980 fair, and counsel for all parties have consented to the Court's treatment of the motion as a request for a permanent injunction. The defendants have moved for summary judgment on the entire case, and argue that the process of tattooing is not protected by the First Amendment. As plaintiff has moved for injunctive relief, the following memorandum constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). The parties have entered into a stipulation of facts, and both plaintiff and defendants have submitted affidavits on various matters.[2]

The parties' "Stipulation of Facts," insofar as it bears on the factual matters in issue here, reads as follows:

1. Plaintiff, David A. Yurkew, Sr., is a tattooist. He practices his profession in a studio entitled "Tattooing by Yurkew," located at 3127 Nicollet Avenue South, Minneapolis, Minnesota, 55408.

2. Plaintiff has been duly licensed as a tattooist by the City of Minneapolis for four years under Minneapolis City Ordinance Chapter 339, "Tattooing." Plaintiff has incurred no violation of Chapter 339.

3. On June 12, 1978, Plaintiff applied to the Minnesota State Fair to request rental space to tattoo patrons of the 1978 Minnesota State Fair.

4. Plaintiff's request was denied in the summer of 1978.

5. On or about February 6, 1979, Plaintiff applied to the Minnesota State Fair to request rental space for the 1979 Fair.

6. On or about June 20, 1979, the State Fair by Defendant James Sinclair sent plaintiff a letter denying plaintiff's request for rental space for the 1979 season.

7. Plaintiff appealed the denial of his request to rent space at the 1979 Fair. He based his appeal on the Minnesota State Fair policy which states that "any space rental applicant adversely affected by a decision of the Space Rental Department shall have the right to petition the Space Rental Review Committee for review of such decision." A hearing was held pursuant to the appeal.

8. On or about July 13, 1979, defendant William Korff, Chairman, Space Rental Review Committee, sent plaintiff a letter denying plaintiff's request for space. The letter stated that "the Board of Managers has determined that tattooing should not be permitted on the fairgrounds."

9. On or about January 4, 1980, plaintiff called the Minnesota State Fair Space Rental Department requesting an application for the 1980 Minnesota State Fair. During this conversation plaintiff was informed by James Sinclair that tattooing would again not be allowed at the Minnesota State Fair.

10. On or about January 4, 1980, defendants [sic] James Sinclair, sent plaintiff a letter stating that "the State Fair has a basic administrative policy which does not allow us to contract space for tattooing during the State Fair. This policy was recently confirmed by the Space Rental Committee of our Board of Managers in June of 1979, and we feel it only appropriate that we advise you as such and indicate at this time that we will be unable to offer you the opportunity to apply for space if you desire to conduct such activities at the 1980 Fair."

11. Some art forms are both sold and exhibited from booth space at the Minnesota State Fair.

12. Tattooing requires sterile instruments and surroundings to minimize the

---

2. Neither plaintiff nor defendants have proffered any objections to the opposition's affidavits, and therefore the matters contained in the affidavits supplement the factual record provided by the parties' stipulation.

dangers of infection and transmission of disease.

13. Tattoos cannot be removed by means other than a surgical procedure. Not all tattoos can be removed by this procedure.

The legislature has delegated certain powers in connection with the State Fair to the Minnesota Agricultural Society, a state agency responsible for the operations of the fair. In Minn.Stat. § 37.16, the Minnesota Agricultural Society is authorized to:

make all bylaws, ordinances, and rules, not inconsistent with law, which it may deem necessary or proper for the government of the fairgrounds and all fairs to be held thereon, and for the protection, health, safety, and comfort of the public thereon; the same to be in effect from the time of filing with the secretary of the society. The violation of a bylaw, rule, or ordinance promulgated by the society is a misdemeanor.

Minn.Stat. § 37.17, subd. 1, provides that the society:

may license and regulate all shows, exhibitions, performances, and privileges on the fairgrounds, and revoke any such licenses, and prohibit, remove, and summarily stop all exhibitions, performances, or privileges which it may deem offensive to good morals or which are contrary to law.

The two most pertinent rules and regulations of the Minnesota Agricultural Society, which govern the Board of Managers of the State Fair, provide as follows:

RULE 11.32 The Management reserves the right to deny acceptance of or prohibit the showing of any exhibit, animal, concession or show that may be falsely entered or represented; or to deny acceptance of or prohibit the showing of an exhibit, animal, concession or show, or to remove any sign, banner, display material or advertising matter if such exhibit and/or display is contrary to law, or violative of the Society's valid interest in providing for the health, safety and/or protection of the fairgoing public. Further, the Management reserves the right to cancel any contract upon receipt of

notice from any fair holding membership in the International Association of Fairs and Expositions and/or the Western Fairs Association, that the exhibitor or concessionaire has been suspended, expelled from or otherwise penalized for violation of contract terms or rules of said member. (1–27–71)

RULE 11.33 The Society recognizes that the State Fair is a proper forum for the free exchange of ideas necessary to a free society, yet reserves the right to regulate and license all concessions and exhibitions on the fairgrounds with regard to time, manner and place in pursuance of its valid interest in maintaining peace and order and in the protection of the general public. (1–27–71)

The policy adopted by the State Fair Board of Managers which prohibits tattooing was apparently developed in response to plaintiff's 1979 application to rent space at the fair. This same policy was invoked by defendants to deny plaintiff rental space at the 1980 fair. In a letter written by V. James Sinclair, plaintiff was informed of the rejection of his request to rent exhibitor's space at the fair for 1980. In that letter, Sinclair noted that it would be permissible, although available space was "minimal," for plaintiff to exhibit "the services [plaintiff is] able to provide," as long as he did not engage in the process of tattooing. The "services" referred to in the Sinclair letter which the defendants would allow plaintiff to exhibit at the fair apparently relate to a display of tattoo images through photographs, illustrations or actual recipients. In an affidavit, the plaintiff has indicated that this latter proposal was unacceptable.

The Minnesota State Fair is an annual event which takes place in Falcon Heights, Minnesota during the late summer. Over one million people attended the 1978 state fair and the attendance for the 1979 state fair amounted to 1,405,669. At the 1979 fair, there were approximately 1,100 concessionaires and exhibitors. For the last two years, there were more applicants for exhibitor space at the fair than there was

actual physical rental space available. The number of new applicants for the 1978 fair amounted to 584, while for 1979, the number of new applicants totaled 750. A variety of different exhibitions are rented space for each fair, and as noted in the stipulation of facts, art forms are both sold and exhibited at the fair. It is unclear how the Board of Managers or its various committees approve the more routine applications for exhibitor space at the fair. In any event, it is not disputed that plaintiff Yurkew's requests for space for the 1979 and 1980 fairs were timely, and presumably he would have obtained exhibitor space at the fair for both 1979 and 1980 were it not for the defendants' policy which prohibits tattooing at the state fair.

The actual process of tattooing requires the injection of dye into the recipient's skin by the use of needles or machines which utilize needles. As is the case with the use of any minor surgical procedure which depends on the injection of a needle into the skin, the transmission of communicable disease, both bacterial or viral, such as hepatitis, is possible if unsanitary conditions are present or unsterile equipment is used. Evidence has been introduced, however, indicating that tattooing is a safe procedure if performed under appropriate sterilized conditions. According to affidavits before the Court, the process of autoclave sterilization, which amounts to steam under pressure, prevents the transmission of communicable diseases, including infectious (type A) and serum (type B) hepatitis. Plaintiff Yurkew

uses the autoclave method of sterilization in his commercial establishment in Minneapolis, and has indicated in an affidavit that he would use the autoclave method of sterilization and comply with the Minneapolis ordinance [3] on tattooing at the fairgrounds should he be granted exhibition space. In addition to the sterilization of the needles, sanitary surroundings must also be maintained in order for the practice of tattooing to be relatively safe.

Plaintiff's First Amendment argument is premised on the assertions that tattoo itself is an art form and that the process of tattooing involves artistic expression. Affidavits [4] authored by Dr. Arnold Rubin and Jan Stussy, both art professors at the University of California, Los Angeles (UCLA), state their respective opinions that tattoo is an art form involving the use of symbolic imagery, creative design and complex technique, and that David Yurkew is a professional artist. On the other hand, John Ondov, the Executive Director of the Minnesota State Arts Board, expressed his opinion in affidavit form that tattoo is not art or an art form.

The plaintiff contends that defendants have engaged in a prior restraint of First Amendment expressive activity by denying him access to a public forum,[5] the state fairgrounds. Plaintiff reasons that this denial of rental space is unlawful because the defendants have failed to establish that the prohibition against tattooing on the state fairgrounds is a reasonable

---

**3.** As the Minnesota state fair is not physically held in Minneapolis, the city ordinance is not applicable, and the municipality where the fair is held has no ordinance on the subject of tattooing.

**4.** A number of affidavits of plaintiff's witnesses, for whatever reason, are cluttered with argument and unqualified opinions on matters of constitutional law, as well as factual matters. Obviously, the Court has not considered these opinions in reaching a decision in this matter. *Marx & Co., Inc. v. Diner's Club, Inc.*, 550 F.2d 505, 509–10 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *McCormick on Evidence*, § 12, at 26–27 (2d ed. 1972).

**5.** A First Amendment "public forum" is a place normally associated with public use, which "serves as constitutional shorthand for the

proposition that, in addition to its usual obligation of content-neutrality . . . government cannot regulate speech-related conduct in such places except in narrow ways shown to be necessary to serve significant governmental interests." Tribe, *American Constitutional Law*, § 12–21 at 689 (1978) [footnote omitted]. *See Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Hague v. C. I. O.*, 307 U.S. 496 (1939). A number of recent cases have held that state fairgrounds amount to public forums for purposes of the First Amendment. *International Soc'y for Krishna Consciousness v. Bowen*, 456 F.Supp. 437 (S.D.Ind.1978), *aff'd*, 601 F.2d 597 (7th Cir. 1979); *International Soc'y for Krishna Consciousness v. State Fair of Texas*, 461 F.Supp. 719 (N.D.Tex.1978).

time, place or manner restriction, and because the denial was effectuated by use of constitutionally deficient procedures. In *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), the United States Supreme Court held that the refusal of Chattanooga municipal officials to rent a city managed theater to plaintiff for a showing of the rock musical "Hair" was accomplished "under a system lacking in constitutionally required minimal procedural safeguards." *Id.* at 552, 95 S.Ct. at 1243. These procedural safeguards, which place the burden on the state to initiate and prove that expression is unprotected, and which require a judicial determination to sustain a prior restraint, were initially developed in the obscenity context, *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and apply as well to prior restraints with respect to access to public forums. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). These procedures are absent in this case, and the State concedes as much. However, the Court's decision in *Southeastern Promotions* is only applicable when the medium of expression in issue is within the First Amendment's protection.

■ The First Amendment protects freedom of speech, and certain conduct, if communicative in character, amounts to protected speech. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (financial contributions); *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (display of American flag with a peace symbol attached); *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (wearing sign on the back of a jacket); *Tinker v. Des Moines Ind. Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing armbands); *Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (demonstration); *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) (picketing). Further, the fact that such activity is undertaken for profit is not in itself an impediment to First Amendment protection. *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The plaintiff seeks to engage in the process of tattooing at the state fair, and has disclaimed any interest in displaying his services, the recipients of his tattoos, or any pictures or the like which depict tattoos he has engrafted on his customers. As the process of tattooing is undeniably conduct, the inquiry here must focus on whether such conduct is First Amendment activity.

■ Thus, the threshold and crucial issue in this case is whether the actual process of tattooing, as opposed to the image conveyed by the tattoo itself,[6] is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments . . . ." *Spence v. Washington*, 418 U.S. 405, 409–10, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974). For a variety of reasons, the Court has concluded that the actual process of tattooing is not sufficiently communicative in nature so as to rise to the plateau of important activity encompassed by the First Amendment. *People v. O'Sullivan*, 96 Misc.2d 52, 409 N.Y. S.2d 332, 333 (1978) (tattooing is not speech or even symbolic speech). Wherever the amorphous line of demarcation exists between protected and unprotected conduct for First Amendment purposes, the Court is convinced that tattooing falls on the unprotected side of the line.

■ There has been some dispute over whether a tattoo, or more properly the image conveyed by the tattoo, is an art form or amounts to art. While the question of whether tattoo is an art form is an intriguing one, the answer is not dispositive, and is essentially of marginal significance here.

6. This distinction must be drawn because plaintiff seeks to engraft tattoos on customers at the fair, and not merely to exhibit the images conveyed by the tattoo. As noted, the defendants have not precluded plaintiff from exhibiting in some form his tattoos, only that the actual process of tattooing is prohibited.

The question of what is art is inherently subjective, as "it is nevertheless often true that one man's vulgarity is another's lyric." *Cohen v. California*, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971). It necessarily follows that courts are ill equipped to determine such illusory and imponderable questions, and that the issue of whether certain conduct comes within the protection of the First Amendment should not invariably depend on whether the final product of the conduct can by some stretch of the imagination be characterized as art or an art form. Thus, the Court does not resolve the issue of whether a tattoo is an art form or amounts to art, and that question is not dispositive of the decision in this matter.

■ In *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the United States Supreme Court upheld the defendant's conviction for draft card burning against the contention that his conduct amounted to protected First Amendment expression. In reaching this conclusion, the Court held that it could not "accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Id.* at 376, 88 S.Ct. at 1678. Thus, merely because Yurkew intends to express an idea through the tattooing process does not raise the conduct to a level protected by the First Amendment. *See People v. O'Sullivan*, 96 Misc.2d 52, 409 N.Y.S.2d 332 (1978); *See also East Hartford Education Ass'n v. Board of Education*, 562 F.2d 838 (2d Cir. 1977) (teacher's failure to wear a necktie is not protected First Amendment activity); *Richards v. Thurston*, 424 F.2d 1281 (1st Cir. 1970) (hair length is not sufficiently communicative to be protected by the First Amendment); *Paladino v. City of Omaha*, 335 F.Supp. 897, 898 (D.Neb.), *aff'd*, 471 F.2d 812 (8th Cir.

1972) ("almost every activity of human life involves elements of communication.").

In *Close v. Lederle*, 424 F.2d 988 (1st Cir. 1970), the defendant school officials removed an exhibition of plaintiff's paintings from a school building before the termination date for the exhibition because the officials determined that the exhibition was inappropriate for its setting. The United States Court of Appeals for the First Circuit held that the removal of plaintiff's artwork did not violate the First Amendment rights of the plaintiff, even though the paintings were not adjudged obscene. Although the plaintiff in *Close* argued that art is as fully protected under the First Amendment as political speech, the *Close* court characterized the plaintiff's "constitutional interest" as "minimal." *Id.* at 990. Here, even assuming that tattooing constitutes an art form, plaintiff's interest in engaging in conduct involving tattooing does not rise to the level of displaying the actual image conveyed by the tattoo, as the tattoo itself is clearly more communicative, and would be regarded as such by the average observer, than the process of engrafting the tattoo on the recipient.

■ A number of other reasons justify the Court's conclusion that the process of tattooing is not sufficiently communicative so as to implicate the First Amendment. The plaintiff has made no showing as to the content of the images he creates through the tattooing process, and there has been no suggestion that political or social thought is conveyed by the final tattooed images. *Close v. Lederle*, 424 F.2d 988 (1st Cir. 1970). Likewise, and significantly, there has been no showing that the normal observer or even the recipient would regard the process of injecting dye into a person's skin through the use of needles as communicative.[7] *Spence v. Washington*, 418 U.S.

---

7. In *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), the United States Supreme Court reversed the conviction of a defendant on First Amendment grounds who had been convicted under a Washington statute which prohibited the exhibition of a United States flag which had attached to it symbols or other extraneous material. The defendant's conduct in *Spence* had consisted of

hanging a United States flag, to which was attached a peace symbol, outside the window of his apartment. The *Spence* Court concluded that a finding that defendant had engaged in a form of communication was "inevitable." *Id.* at 409, 94 S.Ct. at 2729. The Court in *Spence* noted that defendant's activity had coincided with and been triggered by this country's incursion into Cambodia and the Kent State tragedy,

405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); *cf. Crown Central Petroleum Corp. v. Waldman*, 486 F.Supp. 759, 767 (M.D.Pa.1980). Moreover, as sterile and sanitary conditions are essential to safely perform the process of tattooing, the "environment in which [the conduct is] undertaken" were plaintiff to be allowed to tattoo patrons at the fair would hardly be a public setting, which further undermines plaintiff's contention that tattooing is First Amendment activity. *Spence v. Washington*, 418 U.S. 405, 410, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974). Further, the practice of tattooing has not been shown to be a "significant medium for the communication of ideas," nor has it been established that tattooing, as a medium, "may affect public attitudes and behavior . . . ." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501, 72 S.Ct. 777, 780, 96 L.Ed. 1098 (1952) (holding that films were a medium entitled to First Amendment protection).

While the Supreme Court has held that at least some forms of nude or topless dancing, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), and acting in a live performance, *Schacht v. United States*, 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970) are protected by the First Amendment, such decisions are not overly persuasive here, as the essential inquiry in every case is whether the conduct in issue is sufficiently communicative.[8] *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). The process of tattoo-

ing, whatever its virtues or drawbacks, is not, in the view of the Court, "sufficiently imbued with elements of communication" and therefore plaintiff's First Amendment claim must be rejected. *Id.* at 409–10, 94 S.Ct. at 2730; *People v. O'Sullivan*, 96 Misc.2d 52, 409 N.Y.S.2d 332 (1978).

As no First Amendment or other fundamental right of plaintiff has been implicated, the action of the Board of Managers should be upheld if a rational basis exists for their decision. The legislature has provided that the Minnesota Agricultural Society, through the State Fair Board of Managers, should have discretion in determining what exhibitions should be scheduled at the fair. Minn.Stat. §§ 37.16, 37.17. It is also well settled that the legislature or an administrative agency can choose to prohibit rather than regulate certain activity, provided it has a rational basis to do so. *Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Golden v. McCarty*, 337 So.2d 388 (Fla.1976) (upholding the constitutionality of Florida's prohibition of tattooing); *Grossman v. Baumgartner*, 17 N.Y.2d 345, 271 N.Y.S.2d 195, 218 N.E.2d 259 (1966) (upholding the constitutionality of New York City's ban on tattooing). The Court has concluded that the Board of Manager's prohibition of tattooing at the state fair is rationally related to the protection and preservation of the health, safety and welfare of the fair patrons. While the prospect of harm to public health

---

and that "in the surrounding circumstances the likelihood was great that [defendant's] *message would be understood by those who viewed it.*" *Id.* at 411, 94 S.Ct. at 2729. [emphasis added].

In the instant case, as noted, there has been no showing that the normal observer would regard the process of tattooing as communicative in nature, and the Court cannot infer that observers would regard it as such. While this factor is not necessarily dispositive, it is nevertheless an "important" factor, and militates against the conclusion that tattooing is protected by the First Amendment. *Id.* at 408, 94 S.Ct. at 2730.

8. The defendants have attempted to draw a distinction between conduct inherent in the performing arts, such as dancing or acting, and conduct connected with creative arts, which the State contends would not be protected by the First Amendment, as the line of demarca-

tion for determining what is protected and unprotected expression. The State reasons that artistic expression is present at the time of the performance in the context of the performing arts, and thus communication exists at the instant the conduct is accomplished. In the creative arts context, such as painting, or conceivably tattooing, the State reasons that no communication occurs until the final product emerges.

While the State's approach has some merit, it is, in the view of the Court, somewhat simplistic and contains certain drawbacks. The relevant inquiry, according to *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), is simply whether the conduct in issue contains sufficient elements of communication to be regarded as "speech" for purposes of the First Amendment.

may not be compelling, the risk is nevertheless a real one, and it is not irrational for the Board of Managers to choose to ban a potentially dangerous practice rather than run the risk of non-compliance with any regulation. Moreover, the State's interest in protecting fair patrons from purchasing a potentially irreversible tattoo in the carnival charged atmosphere of the state fair can likewise not be considered irrational. It necessarily follows that the Board of Manager's refusal to allow plaintiff to tattoo patrons at the Minnesota State Fair is not unconstitutional.

Accordingly, IT IS HEREBY ORDERED that plaintiff's request for a preliminary or permanent injunction is denied. Further, IT IS HEREBY ORDERED that defendants' motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.