William **KENNEDY** and Karolyne Kennedy, his wife, Plaintiffs,

v.

John **HUGHES,** Mayor of the City of Rehoboth Beach, Delaware; Richard Derrickson, Commissioner of the City of Rehoboth Beach, Delaware; James Phelan, Commissioner of the City of Rehoboth Beach, Delaware; Mary Burt Lankford, Commissioner of the City of Rehoboth Beach, Delaware; Eleanor Lynam, Commissioner of the City of Rehoboth Beach, Delaware, and Samuel Cooper, Commissioner of the City of Rehoboth Beach, Delaware, all individually, personally, and in their official capacity as Mayor and Commissioners of the City of Rehoboth Beach, Delaware, respectively, and The City of Rehoboth Beach, Delaware, a Municipal Corporation of the State of Delaware, and Harry Maichle, Chief of Police of the City of Rehoboth Beach, Delaware (Chief Maichle is joined only for injunctive purposes at this time), Defendants.

Civ. A. No. 82–473 MMS.

United States District Court, D. Delaware.

Nov. 7, 1984.

Robert C. Wolhar, Jr., Wolhar & Moore, Georgetown, Del., for plaintiffs.

Carl Schnee, and Sam Glasscock, III, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for defendants.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Plaintiffs William and Karolyne Kennedy ("the Kennedys") brought this action for damages and injunctive relief under 42 U.S.C. § 1983 against the City of Rehoboth Beach, Delaware, and its Chief of Police, Harry Maichle, in his official capacity. Additional defendants, in their official and individual capacities, are the Mayor, John Hughes, and five City Commissioners. The Kennedys challenge the constitutionality of a city ordinance requiring a physician or osteopath to be present whenever a tattoo is applied in Rehoboth Beach. They also allege that the action of the defendants, in enacting and attempting to enforce this ordinance, caused the Kennedys damages by inhibiting the operation of their tattoo studio. Presently before the Court is the defendants' motion for summary judgment. For the reasons stated below, the motion for summary judgment will be granted.

## I. Facts

The relevant facts are either undisputed or, if disputed, are stated as asserted by the plaintiffs, the party opposing the motion. In May, 1982, the Kennedys made

inquiries in Rehoboth Beach, Delaware, about opening a tattoo studio. In June, 1982, the Kennedys received a letter from Thomas G. Abbott, the Building and Licensing Inspector, stating that tattoo studios were permitted in Rehoboth Beach if the owners obtained a business license. The Kennedys paid a $250 business license fee and received a license to operate a tattoo studio in Rehoboth Beach until June 30, 1983. Plaintiffs then rented a building in Rehoboth Beach to house their studio, purchased equipment for the premises, and incurred other expenses associated with setting up business.

On June 24, 1982, the Mayor of Rehoboth Beach, defendant John Hughes, visited the Kennedys' tattoo studio and told them that "[t]his kind of a business can't be operated in Rehoboth Beach" because it was inconsistent with "a nice family type town."[1] On July 7, 1982, neighboring property owners wrote to the Rehoboth Beach Board of Commissioners and asked the Board to close the tattoo studio "because it is not in keeping with the quaint, unspoiled character of this lovely resort."[2] The Board of Commissioners, which included Mayor Hughes and the five defendant Commissioners, then met on July 9, 1982, with the Kennedys present, and passed the ordinance at issue.

The challenged ordinance amended Chapter 6 of the Municipal Code of Rehoboth Beach by adding a new Article 8, titled "Tattoo Establishments."[3] Section 6–65 of Article 8 mandates that persons operating tattoo establishments must be authorized to practice medicine or osteopathic medicine in Delaware and must obtain a valid permit from the City to operate a tattoo

establishment. This section also provides that all tattooing must be done either by a physician or osteopath or in the presence of a physician or osteopath. Sections 6–74 through 6–78 of the challenged ordinance require the tattoo establishment operator to observe certain health and sanitary requirements that help ensure that the tattooing process itself is sanitary and that persons with communicable diseases, such as hepatitis, will not be tattooed. Section 6–82 enforces Article 8's requirements by providing that any person violating any provision of Article 8 shall be deemed guilty of a misdemeanor and fined between fifty and two hundred dollars.

For the next two or three weeks after this ordinance was passed, the City police, acting on the orders of the Mayor and the Board of Commissioners, began watching the Kennedys' studio for violations of the ordinance. Undercover police officers visited the tattoo studio and threatened to arrest Mrs. Kennedy if they saw her tattooing anyone.[4] Mayor Hughes announced to the press, as reported in a July 21, 1982, article in the Wilmington Morning News, that the Kennedys' studio was under police surveillance. As a result of the ordinance, the police surveillance, and the Mayor's statements to the press, the Kennedys lost business, although they continued to apply tattoos without a doctor being present, in violation of the ordinance.[5] The Kennedys, however, were never charged with violating the ordinance.[6]

On July 26, 1982, plaintiffs filed this action under 42 U.S.C. § 1983 to enjoin enforcement of the ordinance and to recover damages resulting from the deprivations of their civil rights.[7] Plaintiffs alleged in their complaint that the tattooing ordinance

1. Karolyne Kennedy Deposition at 69.

2. Complaint, Exhibit C.

3. Complaint, Exhibit D.

4. Karolyne Kennedy Deposition at 78.

5. Transcript of Hearing on Defendants' Motion for Summary Judgment, May 22, 1984, ("Tr.") at 26.

6. According to plaintiffs' counsel, counsel for the City agreed that the Kennedys would not be

arrested until the plaintiffs' preliminary injunction motion, filed with this Court on July 26, 1982, was resolved. *Id.* at 19.

7. On the same day this action was filed, the City filed an action in the Court of Chancery in Sussex County to enjoin the Kennedys from violating the ordinance. The state court suit has been stayed pending the outcome of this action. *Id.* at 6–7.

violates their rights under the United States Constitution because it constitutes an ex post facto law, bill of attainder, and impairment of the obligation of contracts, in violation of Article I, Sections 9 and 10; a deprivation of liberty and property without due process of law and a denial of the equal protection of the laws, in violation of the fourteenth amendment; and an abridgment of the freedom of speech, in violation of the first amendment. In addition, plaintiffs have alleged that the statements of the Mayor and the police surveillance and harassment deprived them of liberty and property without due process of law.

Upon completion of discovery, defendants filed the instant motion for summary judgment, alleging that defendants are entitled to judgment on two legal grounds: the individual defendants are immune from suit under the doctrine of legislative immunity, and the tattooing ordinance is a constitutional exercise of the City's police power to protect public health. At oral argument, plaintiffs' counsel stated that plaintiffs have abandoned several of their theories and are now only pressing three: that the defendants deprived the plaintiffs of property without due process of law; that the tattooing ordinance violates the fourteenth amendment because it lacks a rational basis; and that the ordinance impaired the obligation of contracts.[8] The Court finds, for the reasons set forth below, that there is no genuine issue as to any material fact and that defendants are entitled to summary judgment as a matter of law.

## II. Monetary Claims Against Individual Defendants In Their Individual Capacities

### A. Claims Arising Out of Passage of the Ordinance

■ The individual defendants argue that the claims against them in their indi-

vidual capacities should be dismissed from this lawsuit because the doctrine of legislative immunity grants them absolute immunity from suit. Plaintiffs do not contest the basic principle that "members of a municipal council acting in a legislative capacity are absolutely immune from damage suits under section 1983." *Aitchison v. Raffiani,* 708 F.2d 96, 99 (3d Cir.1983). *See also Abraham v. Pekarski,* 728 F.2d 167, 174 (3d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984). This doctrine bars plaintiffs' claims against the Mayor and City Commissioners for damages caused by the enactment of the ordinance itself, irrespective of the legislators' motives, because passing an ordinance is legislative activity. *See Aitchison,* 708 F.2d at 98–99.[9]

### B. Claims Arising Out of Enforcement of the Ordinance

■ The absolute protection afforded by legislative immunity does not apply to acts which are executive or administrative rather than legislative in character. *Abraham v. Pekarski,* 728 F.2d at 174–75. Plaintiffs have adduced facts showing that the Mayor and Board of Commissioners instructed the Chief of Police to keep the Kennedys' studio under surveillance, and that the Mayor made public statements about the surveillance.[10] These actions are executive or administrative rather than legislative. *See Blake v. Town of Delaware City,* 441 F.Supp. 1189, 1202 (D.Del.1977); *cf. Marrero v. City of Hialeah,* 625 F.2d 499, 505–06 (5th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981). It follows that plaintiffs' claim that the police activities deprived them of liberty or property without due process of law is not barred by legislative immunity.

---

8. *Id.* at 1490–1491.

9. Plaintiffs urge that the individual defendants have waived the defense of legislative immunity because they are covered by the City's liability insurance policy, and 18 *Del.C.* § 6511 waives the defense of sovereignty for risks covered by state insurance policies. This contention is

meritless. The waiver of sovereign immunity, which applies to state entities or municipalities, does not affect legislative immunity, which applies to individual legislators.

10. Hughes Deposition at 68.

The legal basis of plaintiffs' objection to the actions taken to enforce the statute is not clearly stated in their pleadings or briefs. They apparently assert that the decision of the Mayor and Board of Commissioners to put the tattoo studio under police surveillance, coupled with the Mayor's announcement of the surveillance to the press, deprived them of a property right—their right to do business—without due process of law.[11]

■ Plaintiffs' claims arising out of the police surveillance must be dismissed because there is nothing constitutionally objectionable about the police surveillance. Given that the ordinance was valid, *see infra* at 1495–1496, and the plaintiffs were violating it,[12] the actions of the police—watching the studio to detect violations of the ordinance and warning Mrs. Kennedy that she could be arrested if she violated the ordinance—were simply normal police tactics that do not violate plaintiffs' constitutional rights. *Philadelphia Yearly Meeting of Religious Society of Friends v. Tate*, 519 F.2d 1335, 1337 (3d Cir.1975); *Coffy v. Multi-County Narcotics Bureau*, 600 F.2d 570, 579 (6th Cir.1979).

■ Plaintiffs' objections to the Mayor's public statements that the studio was under surveillance are also without merit. Although their claim is sketchy, plaintiffs apparently assert that the Mayor's statements were defamatory and caused injury to their business reputation and loss of business. An allegation of injury to reputation, when accompanied by an allegation of injury to a more tangible interest, has been held to state a cause of action under section 1983. *See Marrero v. City of Hialeah*, 625 F.2d at 512–20. It is evident, however, that the Mayor's statements were simply true statements of fact, because the studio was in fact under surveillance. True statements of fact are not defamatory as a matter of law and do not deprive plaintiffs of any constitutionally protected interest. *Id.* at 519 n. 25; *see DeBonaventura v. Nationwide Mutual Insurance*

*Co.*, 428 A.2d 1151, 1155 (Del.1981); *cf. Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 883, 51 L.Ed.2d 92 (1977) (per curiam) (plaintiff must allege that defamatory reasons given in connection with his firing are false in order to maintain his due process claim). Accordingly, judgment will be entered for the defendants on the plaintiffs' claims arising out of actions taken by defendants to enforce the ordinance.

In summary, the only claims against the individual defendants in their individual capacities arise out of passage and enforcement of the ordinance. Monetary damages against the individual defendants are not available to plaintiffs. The doctrine of legislative immunity bars any claim predicated upon passage of the ordinance, while the method of enforcement of the ordinance violates neither the federal constitution nor, if it was plaintiffs' theory, any state law. Summary judgment will be entered for the individual defendants in their individual capacities with respect to monetary damages. There remain plaintiffs' claims for monetary damages against the City and injunctive relief as to all defendants. These claims are predicated upon the unconstitutionality of the ordinance.

## III. Constitutional Claims Against the City

### A. Due Process and Equal Protection Claims

■ The heart of plaintiffs' action is their claim that the tattooing ordinance violates their constitutional rights of equal protection and substantive due process under the fourteenth amendment. The first step in considering the equal protection claim is to determine the appropriate level of judicial scrutiny to be applied to the ordinance. "Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only

---

**11.** *See* Tr. at 23–26.

**12.** Tr. at 26.

that the classification challenged be rationally related to a legitimate state interest." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976) (per curiam). Since the rights asserted by the plaintiffs are not "fundamental" as that term is defined in constitutional jurisprudence, *see Pollard v. Cockrell,* 578 F.2d 1002, 1012 (5th Cir.1978), and since no suspect class or classification requiring "intermediate scrutiny" is involved, *see Plyler v. Doe,* 457 U.S. 202, 217–18, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982), the ordinance must be upheld against equal protection attack if the statutory classifications are rationally related to a legitimate state purpose. *City of New Orleans v. Dukes,* 427 U.S. at 303, 96 S.Ct. at 2516.

■ This rationality standard is essentially the same standard that applies to claims that legislation violates the due process clause. *See Harper v. Lindsay,* 616 F.2d 849, 854 n. 9 (5th Cir.1980); *Malmed v. Thornburgh,* 621 F.2d 565, 569 (3d Cir.), *cert. denied,* 449 U.S. 955, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980); *cf. Hodel v. Indiana,* 452 U.S. 314, 331–33, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981) (construing fifth amendment due process and equal protection guarantees).[13] The minimal substantive requirements of the due process clause are satisfied if "there is an evil at hand for correction, and ... it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical Inc.,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). This standard of review is satisfied if the statute has a conceivable, rational basis:

> In reviewing a state statute ... under the due process or equal protection clause, a court must determine if the provision rationally furthers *any* legitimate state objective. "For these pur-

poses, it is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislative decision...." *Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960). The court may even hypothesize the motivations of the state legislature to find a legitimate objective promoted by the provision under attack. The legitimate purpose justifying the provision need not be the primary purpose of the provision.

*Malmed v. Thornburgh,* 621 F.2d at 569 (citations omitted); *see also McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) ("A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."). Thus, the due process and equal protection clauses will be satisfied if the tattooing ordinance has a conceivable legitimate purpose and if the statutory methods used to advance that purpose are rational.

The purpose of the ordinance is recited in the preamble: "regulation of tattoo establishments is essential for the protection of the public health." This purpose is legitimate, because public health regulation is a "vital part" of a state's police power. *Barsky v. Board of Regents,* 347 U.S. 442, 449, 74 S.Ct. 650, 654, 98 L.Ed. 829 (1954).

Plaintiffs do not contest the legitimacy of the public health regulation, nor do they dispute that tattooing can spread disease and create health problems.[14] Moreover, plaintiffs do not urge that the Board's choice of tattoo establishments for regulation is irrational or discriminatory. Instead, they object to the ordinance's requirement that a doctor or osteopath be present during tattooing. They have placed in the record two facts from which they infer that the "real" purpose of this

---

13. Indeed, plaintiffs have not made separate due process and equal protection arguments against the ordinance; their sole objection is that the ordinance is irrational. *See* Tr. at 3–4.

14. *See* Tr. at 22; Plaintiffs' Answering Brief In Opposition to Defendants' Motion For Summary Judgment at 15–17. Other courts considering

the validity of tattooing regulations have found that tattooing creates health problems. *See Yurkew v. Sinclair,* 495 F.Supp. 1248, 1255–56 (D.Minn.1980); *Golden v. McCarty,* 337 So.2d 388, 390 (Fla.1976); *Grossman v. Baumgartner,* 17 N.Y.2d 345, 271 N.Y.S.2d 195, 197, 218 N.E.2d 259, 261 (1966).

requirement is to exclude tattoo businesses from Rehoboth Beach:[15] first, the Mayor's request that they leave Rehoboth Beach because tattooing was inconsistent with the "nice family type town" image of Rehoboth Beach;[16] second, the Board of Commissioners' receipt, before passing the ordinance, of a letter that objected to the Kennedys' business for similar reasons.[17]

The facts from which plaintiffs divine their inferences are irrelevant to the determination of legislative purpose, because "a judiciary must judge by results, not by the varied factors which may have determined legislators' votes. [The Court] cannot undertake a search for motive in testing constitutionality." *Daniel v. Family Security Life Ins. Co.*, 336 U.S. 220, 224, 69 S.Ct. 550, 552, 93 L.Ed. 632 (1949). *See also Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 309 n. 5, 65 S.Ct. 1137, 1140 n. 5, 89 L.Ed. 1628 (1945); *Soon Hing v. Crowley*, 113 U.S. 703, 5 S.Ct. 730, 28 L.Ed. 1145 (1885); *Detroit United Ry. v. City of Detroit*, 255 U.S. 171, 178, 41 S.Ct. 285, 287, 65 L.Ed. 570 (1921). Even assuming that one purpose of the ordinance was that inferred by plaintiffs, the proper inquiry under the equal protection and due process clauses is whether the ordinance has *any* legitimate purpose. *Malmed v. Thornburgh, supra.* A legitimate purpose of the ordinance—protecting public health—is plain from its language. Plaintiffs' allegedly contrary facts from which they derive their inferences would lead the Court on an impermissible "search for motive." An inference which ultimately questions the motive of a legislature in opposition to the purpose stated in the legislative preamble, without more, may not be employed to defeat a motion for summary judgment.

Plaintiffs also argue that the sanitary measures prescribed in unchallenged sections of the statute are adequate to protect against the dangers associated with tattooing, and that the additional requirement that a physician be present is unnecessary.[18] A similar claim was made in *Roschen v. Ward*, 279 U.S. 337, 49 S.Ct. 336, 73 L.Ed. 722 (1929). The law at issue in *Roschen* made it unlawful for a store to sell eyeglasses unless a licensed physician or optometrist was present. *Id.* at 338, 49 S.Ct. at 336. The complainants claimed that this requirement was unnecessary in most instances, and that the cost of employing an optometrist would drive them from the eyeglass business. *Id.* at 339, 49 S.Ct. at 336. The Court did not examine the necessity of an optometrist's presence, but simply found that the requirement was rational: "there can be no doubt that the presence and superintendence of the specialist tend to diminish an evil." *Id.* The complainants further argued that the legislation did more harm than good, but the Court responded: "[T]he balancing of the considerations of advantage and disadvantage is for the legislature not for the Courts." *Id.* at 340, 49 S.Ct. at 336. *Accord Williamson v. Lee Optical Inc.*, 348 U.S. 483, 487, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955).

Plaintiffs' assertion that the physician requirement is unnecessary is similar to the claim in *Roschen* that an optician was unnecessary. Plaintiffs ask the Court to second-guess the decision of the Rehoboth Beach Board of Commissioners that the presence of a physician is needed to protect public health. However, "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations ...." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976) (per curiam). The physician requirement has a conceivable, rational basis. *See Malmed v. Thornburgh, supra; McGowan v. Maryland, supra.* As in *Roschen*, there can be no doubt that the presence of a physician will diminish health problems associated

---

**15.** *Id.* at 17.

**16.** Karolyne Kennedy Deposition at 69.

**17.** Complaint, Exhibit C.

**18.** In equal protection terms, plaintiffs' contention apparently is that the discrimination between physician tattooers and lay tattooers is irrational.

with tattooing. The Board rationally could have concluded that a person with medical training would be better trained than a lay person in recognizing individuals with communicable diseases and monitoring the tattooing process against health hazards. For this reason, other courts that have ruled on constitutional challenges to regulations requiring a physician's presence during tattooing have upheld the regulations. *Grossman v. Baumgartner*, 22 A.D.2d 100, 254 N.Y.S.2d 335, 337–38 (1964), *aff'd*, 17 N.Y.2d 345, 271 N.Y.S.2d 195, 218 N.E.2d 259 (1966); *Golden v. McCarty*, 337 So.2d 388, 390–91, 81 A.L.R.3d 1206 (Fla.1976). Indeed, an outright ban on tattooing for health reasons has been upheld against due process attack. *Yurkew v. Sinclair*, 495 F.Supp. 1248, 1256–57 (D.Minn.1980).

Mrs. Kennedy also contends that since she follows sanitary procedures and can recognize persons with contagious diseases, the ordinance is irrational as applied to her. Even if the Board had accepted this contention, the Board could have rationally concluded that most tattoo studio operators would not possess Mrs. Kennedy's expertise and that general regulation of tattooing, including the physician requirement, was warranted. *See Grossman v. Baumgartner*, 254 N.Y.S.2d at 338; *cf. Murphy v. California*, 225 U.S. 623, 628–29, 32 S.Ct. 697, 698, 56 L.Ed. 1229 (1912) (evidence that defendant ran an orderly, moral pool hall did not controvert legislative finding that pool halls tend to be immoral and disorderly). In short, it is evident that the tattooing ordinance serves a valid purpose—public health protection—and that the physician requirement is rationally related to that purpose. Thus, the challenged ordinance does not violate the due process and equal protection clauses, and judgment will be entered for the defendants on those claims.

### B. Impairment of Contracts Claim

Plaintiffs also contend that the business license they obtained in order to open their tattoo studio was a contract between the plaintiffs and the City. They assert this contract entitled them to operate their studio without police interference until their license was revoked in accordance with the procedures described in the business licensing ordinance.

Plaintiffs misunderstand the nature of a business license and the impairment of contracts clause. Absent clear, unequivocal language to the contrary, an ordinary business license is not considered to be a contract between a government and private parties. *Seaboard Air Line Ry. v. City of Raleigh*, 242 U.S. 15, 18, 37 S.Ct. 8, 9, 61 L.Ed. 121 (1916); *City of St. Louis v. United Ry.*, 210 U.S. 266, 274, 28 S.Ct. 630, 632, 52 L.Ed. 1054 (1908). There is nothing in Article 2 of the Rehoboth Beach Code, setting out the licensing procedure, or on the face of the Kennedys' license itself that would suggest that it creates a contract between the City and the plaintiffs.[19] Moreover, there is nothing to suggest that the license restricts in any way the ability of the City to impose additional burdens on the license holder, or to regulate the licensee's business.

It is presumed, absent unequivocal language, that a city, in granting a license, reserves the ability to exercise its police power and place additional regulatory burdens on license holders. *City of St. Louis v. United Ry.*, 210 U.S. 266, 274, 28 S.Ct. 630, 632, 52 L.Ed. 1054 (1908); *see City of El Paso v. Simmons*, 379 U.S. 497, 508, 85 S.Ct. 577, 583, 13 L.Ed.2d 446 (1965). No such restrictive language concerning the City's police power is contained in the license or the licensing statute. Consequently, plaintiffs' claim that the tattooing ordinance and measures taken to enforce it violated the impairment of contracts clause is rejected.

Plaintiffs' final contention combines their due process and contracts

---

19. *See* Appendix to Plaintiffs' Answering Brief In Opposition To Defendants' Motion For Summary Judgment, Dkt. 41, at A–2–A–7.

clause attacks. Plaintiffs assert the defendants' actions had the same effect as the revocation of a business license, and their license could only be revoked if the City followed the revocation procedures set forth in Article 2, section 6–12. This section provides: "The City Manager shall revoke the license of any licensee because of any violation of ... any ... ordinance of the City of Rehoboth Beach." The licensee has the right to receive notice in advance of the revocation and, upon appeal, to have a hearing. Rehoboth Beach Code §§ 6–12, 6–13.

Although these procedures were not followed, it is undisputed that the plaintiffs' license was not revoked. It follows that there has been no deprivation of the license to trigger the statutory or constitutional due process requirements.[20] Plaintiffs urge the defendants' actions amounted to a *de facto* revocation of the license. This assertion is nothing more than a restatement of their claims, rejected above, that the defendants' actions deprived them of liberty and property—their business license—without due process, and that the defendants violated the contracts clause. In short, plaintiffs' attack on the failure of the City to follow statutory revocation procedures is without merit.

## IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment will be granted.

---

**20.** In fact, the Kennedys continued to operate their tattoo studio and apply tattoos, in violation of the ordinance, for the remainder of the license period. Tr. at 17–18, 23.