560 S.E.2d 420

**The STATE, Respondent,**

v.

**Ronald P. WHITE, Appellant.**

**No. 25421.**

Supreme Court of South Carolina.

Heard Nov. 14, 2001.

Decided March 4, 2002.

Rehearing Denied March 21, 2002.

534

Jared S. Newman, of Daugs, Tedder, & Newman, of Port Royal, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson, all of Columbia, Solicitor E.L. Clements, III, Twelfth Judicial Circuit, of Florence, for respondent.

Chief Justice TOAL.

Ronald P. White ("Appellant") appeals his conviction for violation of section 16–17–700 of the South Carolina Code, prohibiting the tattooing of another person except by a licensed physician for cosmetic or reconstructive purposes. S.C.Code Ann. § 16–17–700 (Supp.2000). We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

Appellant was indicted by the grand jury for the Court of General Sessions of Florence County for violating section 16–17–700 of the South Carolina Code. Appellant was arrested sometime after WBTW TV aired a clip of him tattooing

another person in his Florence County residence as part of a series WBTW prepared on tattooing. At trial, Appellant admitted he violated the statute, but argued the statute was unconstitutional on several grounds. Appellant made a motion to quash the indictment at the beginning of trial, arguing the statute was unconstitutional because (1) it impermissibly restricted his freedom of speech in violation of the First Amendment of the United States Constitution and Article I, Section 2 of the South Carolina Constitution, (2) it restricted interstate commerce, and (3) it violated the Privileges and Immunities Clause of the United States Constitution.

The trial court found the statute constitutional. First, it found that tattooing was not speech, and, second, even if it were, prohibition of tattooing was a valid exercise of state power because of its impact on public health. The court dismissed Appellant's other constitutional claims on the same grounds, stating that the legislature may use "appropriate means" to "regulate or prohibit, if necessary" any occupation to protect public health. Finally, the court found that all contract and property rights are subject to "fair exercise of the police power to promote the general welfare." As Appellant admitted he violated the statute, he was found guilty as charged. He was sentenced to one year imprisonment and fined $2,500.00, suspended to five years of probation and a fine of $500.00.

The trial court did not hear any expert medical testimony regarding the dangers of tattooing or the risks to public health caused by the process of tattooing. In finding tattooing posed a risk to public health, the trial court relied on Appellant's own concession that there were risks to unregulated tattooing and on the general notion that it is the legislature's responsibility to decide what is injurious to public health.

Appellant appeals the trial court's decision, raising the following issue:

Did the trial court err in finding section 16–17–700 of the South Carolina Code [1] does not violate Appellant's freedom of speech as protected by the First Amendment of the United States Constitution [2] and Article I, Section 2 of the

---

1. S.C.Code Ann. § 16–17–700 (Supp.2000).

2. U.S. Const. amend. I.

South Carolina Constitution [3]?

## LAW/ANALYSIS

Appellant argues the trial court incorrectly upheld section 16-17-700 of the South Carolina Code, insisting the act of tattooing constitutes speech protected by the First Amendment. Appellant argues tattoos are a form of art or expression protected by the First Amendment. Assuming tattoos are protected expression, Appellant reasons those who create them should be afforded the same protection that he claims the creators of other protected expression enjoy (e.g., writers, painters, and sculptors). Appellant contends the process of tattooing cannot be separated from the display of the tattoo itself and both are protected under the First Amendment. We disagree.

The State argues that the trial court correctly upheld the statute, finding tattooing is not speech, and a rational relationship exists between the statute and public health. For support, the State cites several out of state, appellate and trial level opinions in which similar statutes have been upheld. *State v. Brady,* 492 N.E.2d 34 (Ind.App.1986); *People v. O'Sullivan,* 96 Misc.2d 52, 409 N.Y.S.2d 332 (N.Y.Sup.App. Term1978); *Yurkew v. Sinclair,* 495 F.Supp. 1248 (D.Minn. 1980). In each of these opinions, the court found tattooing did not constitute speech and then proceeded to analyze the statute applying a rational basis standard. *Id.* Each court determined (largely based on their common knowledge) that there are inherent risks to tattooing and gave the state's legislature wide latitude to determine how to best protect the general welfare of the state's inhabitants. *Id.* We agree with this position.

Our precedent establishes a general presumption of validity for legislative acts when subjected to constitutional attack, which can be overcome only by a clear showing that the act violates some provision of the Constitution. *Main v. Thomason,* 342 S.C. 79, 535 S.E.2d 918 (2000); *State v. Brown,* 317 S.C. 55, 451 S.E.2d 888 (1994). This presumption places the initial burden on the party challenging the constitutionality

3. S.C. Const. art. I, § 2.

of the legislation to show it violates a provision of the Constitution. If the challenging party is able to show the act is invalid, leaving "no room for reasonable doubt that it violates some provision of the Constitution," the burden shifts to the state. *Thomason,* 342 S.C. at 86, 535 S.E.2d at 921 (citing *Westvaco Corp. v. South Carolina Dep't of Revenue,* 321 S.C. 59, 467 S.E.2d 739 (1995)). If the challenging party is unable to do so, however, it has not met its burden, and the challenge fails under this analysis.

Whether or not tattooing qualifies as speech, symbolic speech, or otherwise protected expression under the First Amendment is an issue of first impression in South Carolina. We look to the United States Supreme Court for guidance in analyzing this issue. According to the United States Supreme Court, the First Amendment protects speech, including conduct, if sufficiently communicative in character. *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). The threshold question then is whether the conduct in issue is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* at 409, 94 S.Ct. at 2730, 41 L.Ed.2d at 846. Admittedly, this test requires line drawing. The Supreme Court has acknowledged this implicitly, but held it could not "accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672, 679 (1968) (upholding defendant's conviction for burning his draft card on the courthouse steps against the challenge that the conduct amounted to expression protected by the First Amendment).

In determining whether certain conduct is within the boundaries of First Amendment protection, the Supreme Court has "asked whether [a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342, 353 (1989) (citing *Spence,* 418 U.S. at 410–411, 94 S.Ct. at 2730, 41 L.Ed.2d at 846) (finding defendant's burning of the American flag during the Republican party's renomination of Ronald Reagan for President to be sufficiently imbued

with elements of communication to qualify as protected conduct). In *Johnson*, the Supreme Court found the traditional use of flags for the communication of beliefs and the context in which the flag was burned to be instructive in determining the conduct was protected. *Id.* Additionally, the Supreme Court has considered relevant whether the conduct at issue would qualify as a "medium" for expression. *Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501, 72 S.Ct. 777, 780, 96 L.Ed. 1098, 1105 (1952) (holding film to be protected under the First Amendment after noting it was a "significant medium for the communication of ideas").

In the present case, the resolution of Appellant's claim that the process of tattooing is protected expression depends on whether the Court finds that tattooing is "sufficiently imbued with elements of communication" as required by *Spence v. Washington.* 418 U.S. at 409, 94 S.Ct. at 2730, 41 L.Ed.2d at 846. Appellant claims the act of tattooing is artistic self-expression. However, the relevant inquiry is whether the act of tattooing is sufficiently communicative to warrant protection. Appellant has not made any showing that the *process* of tattooing is communicative enough to automatically fall within First Amendment protection. Burning of the flag, despite its potential safety risks, was protected because it conveyed an obvious political message. *Johnson.* Unlike burning the flag, the process of injecting dye to create the tattoo is not sufficiently communicative to warrant protections and outweigh the risks to public safety.

We agree with the dissent to the extent it argues content is not a justifiable reason to regulate tattooing, but find that the danger associated with the activity of tattooing, whether artwork or not, is a legitimate reason to regulate it. The dissent fails to recognize that tattooing, as opposed to painting, writing, or sculpting, is unique in that it involves invasion of human tissue and, therefore, may be subject to state regulation to which other art forms (on non-human mediums) may not be lawfully subjected.

In *O'Brien*, the Supreme Court made it clear the First Amendment does not protect all expressive conduct, even if intended to communicate. As discussed, application of the Supreme Court's test to determine what conduct is protected

requires some line drawing. Based on the record before us, we find that the act of tattooing falls on the unprotected side of the line. Appellant has not met his burden to show why tattooing, an invasive procedure, with inherent health risks, would fall within the First Amendment. *State v. Brady; People v. O'Sullivan; Yurkew v. Sinclair.*

Because we find the statute does not prohibit constitutionally protected conduct under the First Amendment, we will apply the test enunciated by this Court in *Main v. Thomason,* 342 S.C. 79, 535 S.E.2d 918 (2000). In *Thomason,* we addressed the extent of the legislature's authority to legislate for the protection of public health and general welfare. This Court stated, "[c]ourts will not interfere with the enforcement of regulations designed for the protection of health, welfare, and safety of citizens unless they are determined to be unreasonable." *Id.* at 86–87, 535 S.E.2d at 921–22 (citing *Richards v. City of Columbia,* 227 S.C. 538, 88 S.E.2d 683 (1955)). "[T]he exercise of the police power is subject to judicial correction *only if* the action is arbitrary and has no reasonable relation to a lawful purpose." *Id.* at 87, 535 S.E.2d at 922 (emphasis added).

■ Under this analysis the challenging party again bears the initial burden, albeit a lesser one, to show the statute is arbitrary and has no reasonable relation to a lawful purpose. *Thomason.* If the challenging party makes this showing of arbitrariness, the burden shifts to the State to prove reasonableness. *City Council of Virginia Beach v. Harrell, III,* 236 Va. 99, 372 S.E.2d 139 (1988).[4] If the challenger cannot meet this threshold burden, the statute is presumed to have a rational relationship to a legitimate purpose within the authority of the legislature's police power and will be upheld.

■ In our opinion, Appellant, in this case, has not met this threshold burden; he has not rebutted the presumption of

---

4. The Virginia Supreme Court described the analysis succinctly: "if the reasonableness of the enactment is fairly debatable, a court will not substitute its judgment for that of the legislative body. When, however, the presumption of validity is challenged by probative evidence of unreasonableness, the enactment cannot be sustained unless the legislative body meets the challenge with some evidence of reasonableness." *Id.* at 101–02, 372 S.E.2d at 141.

validity by showing the statute is arbitrary and unreasonable, with no relation to a legitimate governmental interest. *Thomason*. Appellant put forth no evidence other than his own testimony and the testimony of Mr. Black, a licensed tattoo artist in 12 states, regarding the safety or danger of tattooing. Neither Appellant nor Mr. Black has any medical training and both admitted there are risks to tattooing if the proper precautions are not taken. Although the State also failed to introduce current evidence of the risks associated with tattoos, the burden rested on Appellant to show the prohibition bears no reasonable relation to public health. The State argues tattooing can lead to hepatitis and other communicable diseases, and Appellant admitted tattooing does cause these risks if the proper sterilization measures are not taken. According to Appellant's own testimony, then, in the absence of affirmative regulation by the State, tattooing can endanger public health. With this admission, Appellant as much as conceded a rational relationship between tattooing and public health. As discussed, the legislature's exercise of police power is not subject to judicial correction unless its action is arbitrary and unreasonable. *Thomason*.

The rational basis analysis set out in our precedent to test the legislature's authority under its police power gives the statute a strong presumption of validity. Appellant has not put forth any evidence to show that S.C.Code Ann. § 16–17–700 serves no legitimate interest in protecting public health and thus has not overcome the presumption of constitutionality.

### CONCLUSION

For the foregoing reasons, we **AFFIRM** the trial court and uphold Appellant's conviction.

MOORE, BURNETT and PLEICONES, JJ., concur.

WALLER, J., dissents in a separate opinion.

Justice WALLER dissenting.

I dissent. In my opinion, tattooing is "sufficiently imbued with elements of communication so as to fall within the scope of the First Amendment." *State v. Ramsey*, 311 S.C. 555, 430 S.E.2d 511 (1993).

The majority recognizes that, in determining whether conduct is protected by the First Amendment, the United States Supreme Court inquires whether an "intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).[5] In my view, there is no doubt that, in creating words, pictures, or images on the bodies of those who wear tattoos, White is intending to convey a message and the message is likely to be understood by those who view it.

In my opinion, White's conduct in creating tattoos is a form of art which is entitled to the same protection as any other form of art. If a painter who creates an image on a piece of canvas has created a work of "art" thereby engaging in "speech" worthy of First Amendment protection, I see no reason why a tattoo artist who creates the same image on a person's body should be entitled to less protection.[6] In my view, whether or not something is "speech" protected by the First Amendment cannot focus upon the medium chosen for its expression.[7]

Although the majority cites several cases which have held that tattooing is not "speech," those cases were decided in an era when tattooing was regarded as something of an anti-social sentiment.[8] As noted in a recent synopsis,

The cultural status of tattooing has steadily evolved from that of an anti-social activity in the 1960s to that of a trendy

---

**5.** *Johnson* held burning an American flag constitutes speech worthy of First Amendment protection.

**6.** As noted recently in a New York Times article, "Some people buy a van Gogh. Some people buy art by Tattoo Lou. They wear it or they hang it. But it is all art." New York Times; Long Island Weekly Desk, *In this Artist's Hands, Skin is the Canvas* (Sunday, July 1, 2001).

**7.** Indeed, it would be ludicrous to suggest that because Michelangelo chose the ceiling of the Sistine Chapel upon which to paint, his renderings are not communicative.

**8.** Moreover, certiorari to the United States Supreme Court was not sought in any of the cited cases, and it appears that Court has never addressed this issue.

fashion statement in the 1990s. First adopted and flaunted by influential rock stars like the Rolling Stones in the early 1970s, tattooing had, by the late 1980s, become accepted by ever broader segments of mainstream society. Today, tattoos are routinely seen on rock stars, professional sports figures, ice skating champions, fashion models, movie stars and other public figures who play a significant role in setting the culture's contemporary mores and behavior patterns ...

The market demographics for tattoo services are now skewed heavily toward mainstream customers. Tattooing today is the sixth-fastest-growing retail business in the United States. The single fastest growing demographic group seeking tattoo services is, to the surprise of many, middle-class suburban women. ·

Tattooing is recognized by government agencies as both an art form and a profession and tattoo-related art work is the subject of museum, gallery and educational institution art shows across the United States.

"TheChangingCulturalStatusofTattooArt" (http:/www.tattooartist.com/history.html); *See also* Lawrence Muhammed, *Tattoo You*, Chicago Tribune (Nov. 4, 1997)(recognizing that tattoos have begun to appeal to people from every walk of life, and that, contrary to popular belief, there is no serious health risk involved in getting a tattoo, either. In most tattoo parlors, needles and inks are single-serve, gloves are worn and other utensils are steam/autoclave-sterilized, the same method used by hospitals for surgical equipment).

Consistent with the more modern trend, it is my opinion the process of tattooing is indeed a protectable form of speech.[9]

Accordingly, since tattooing may be considered speech, it is subject to a higher level of scrutiny than that imposed by the

---

**9.** The majority, by its emphasis of the word "process," appears to indicate that although the process of tattooing is not "speech," the end product thereof may be, such that the tattoo wearer may be entitled to First Amendment protection as the conveyor of a message. In my view, this is akin to saying that an author who is paid a commission to write a book by a publisher, or an artist commissioned to paint a rendering, does not engage in speech, but that the publisher, and purchaser of the painting, do engage in speech. I find such an analysis completely untenable.

majority. As White concedes, section 16–17–700 is, in effect, a "content-neutral" regulation which is subject to an intermediate level of scrutiny, i.e., it will be sustained if it a) furthers an important governmental interest, b) that interest is unrelated to the suppression of free speech, and c) the incidental restriction on speech is no greater than essential to the furtherance of that interest.[10] *See Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). In interpreting "content-neutral" ordinances, this Court has noted that "[p]ermissible time, place, and manner restrictions are justified by a substantial governmental interest unrelated to free speech and allow[ ] for adequate alternative avenues of communication . . ." *Harkins v. Greenville County*, 340 S.C. 606, 613, 533 S.E.2d 886, 890 (2000).

Here, section 16–17–700 effectively provides no alternative avenue of communication; it makes it unlawful for a person to tattoo any part of the body of another person, but provides that "[i]t is not unlawful for a licensed physician or surgeon to tattoo part of a patient's body if in his medical opinion it is necessary when performing cosmetic or reconstructive surgery." It taxes the brain to conceive of a manner in which White may practice his tattoo artistry. Even assuming, *arguendo*, he were to attend medical school and obtain a medical degree and license to practice medicine, he would still not be permitted to exercise his artistry for the purpose of expressing a communicative idea; the statute forbids tattooing unless it is medically necessary while performing cosmetic or reconstructive surgery. The statute is, in effect, a complete ban on any and all tattooing when done for artistic or communicative purposes. In my view, such a complete ban on the right of free speech cannot stand.

Although I agree, wholeheartedly, that the state may stringently regulate tattooing, the present record is insufficient to demonstrate that the restriction on White's speech is "no greater than essential" to the furtherance of the state's interest in protecting the health and well-being of its citizens.[11]

---

**10.** White concedes section 16–17–700 meets the first two prongs.

**11.** In fact, as noted by White in brief, some 46 states permit and regulate tattooing, and "[n]ot one reported death has been associated with tattooing in its five thousand year history."

Accordingly, I would hold section 16–17–700 violates White's First Amendment right of free speech.