**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHNNY ANDERSON,
          *Plaintiff-Appellant,*

v.

CITY OF HERMOSA BEACH, a
California Municipal Corporation,
          *Defendant-Appellee.*

No. 08-56914

D.C. No.
2:07-cv-05923-
CAS-E

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
May 7, 2010—Pasadena, California

Filed September 9, 2010

Before: John T. Noonan, Richard R. Clifton and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Concurrence by Judge Noonan

13739

**COUNSEL**

Robert C. Moest, Law Offices of Robert C. Moest, Santa Monica, California, for the plaintiff-appellant.

John C. Cotti, Jenkins & Hogin, LLP, Manhattan Beach, California, for the defendant-appellee.

**OPINION**

BYBEE, Circuit Judge:

We address a question of first impression in our circuit: whether a municipal ban on tattoo parlors violates the First Amendment. Although courts in several jurisdictions have upheld such bans against First Amendment challenges, *see, e.g.*, *Hold Fast Tattoo, LLC v. City of North Chicago*, 580 F. Supp. 2d 656, 659-61 (N.D. Ill. 2008); *Yurkew v. Sinclair*, 495 F. Supp. 1248, 1253-55 (D. Minn. 1980); *State v. Brady*, 492 N.E.2d 34, 39 (Ind. Ct. App. 1986); *People v. O'Sullivan*, 409 N.Y.S.2d 332, 333 (App. Div. 1978); *State v. White*, 560 S.E.2d 420, 423-24 (S.C. 2002); *Blue Horseshoe Tattoo, V, Ltd. v. City of Norfolk*, 72 Va. Cir. 388, 390 (Cir. Ct. 2007), we respectfully disagree. We hold that tattooing is purely expressive activity fully protected by the First Amendment, and that a total ban on such activity is not a reasonable "time, place, or manner" restriction.

## I.   BACKGROUND

Petitioner-Appellant Johnny Anderson seeks to establish a tattoo parlor in Defendant-Appellee City of Hermosa Beach

(the "City"), but Hermosa Beach Municipal Code ("Code") § 17.06.070 effectively bans tattoo parlors. Anderson sued the City under 42 U.S.C. § 1983, alleging that § 17.06.070 is facially unconstitutional under the First and Fourteenth Amendments. The parties filed cross-motions for summary judgment, and the district court denied Anderson's motion and granted the City's motion. Anderson now appeals this decision.

We begin with the relevant background information, starting with a brief explanation of the process and health implications of tattooing,[1] followed by a summary of the laws regulating tattooing in the State of California and its subdivisions, and ending with a more detailed description of the facts and procedural history in Anderson's particular case.

## A.  Tattooing

A declaration provided by the City sums up well the process of tattooing:

> A tattoo is created by injecting ink into a person's skin. To do this, an electrically powered tattoo machine, often called a gun, moves a solid needle up and down to puncture the skin between 50 and 3,000 times per minute. The needle penetrates the skin by about a millimeter and deposits a drop of insoluble ink into the skin with each puncture. The ink is deposited in the dermis, which is the second layer of skin. . . . Because the skin has been punctured many times, the end result is essentially an open wound.

---

[1]Throughout most of this opinion, we use "tattooing" as shorthand to refer not only to the process of tattooing but also to the *business* of tattooing—that is, the procedure under which the tattooist injects a tattoo into a person's skin in exchange for money. In Part III.A, however, we break down tattooing into each of its component parts: the tattoo itself, the physical process of tattooing, and the business of tattooing.

Tattooing carries the risk of infection and transmission of disease "if unsanitary conditions are present or unsterile equipment is used." *Yurkew*, 495 F. Supp. at 1252. The City's declarations establish that tattooing can result in the transmission of such diseases as hepatitis, syphilis, tuberculosis, leprosy, and HIV. Reports from the Centers for Disease Control and Prevention and the Food and Drug Administration confirm the significant health risks of tattooing. *See* Centers for Disease Control and Prevention, *Body Art: Tattoos and Piercings* (Jan. 21, 2008), *available at* http://www.cdc.gov/features/bodyart (last visited May 25, 2010) (noting risks of infection, tuberculosis, Hepatitis B and C, and HIV); United States Food and Drug Administration, *Tattoos & Permanent Makeup* (Nov. 29, 2000), *available at* http://www.fda.gov/cosmetics/productandingredientsafety/productinformation/ucm108530.htm (last visited May 25, 2010) (discussing risks of infection, removal problems, potential allergic reactions, and MRI complications).

In general, however, "tattooing is a safe procedure if performed under appropriate sterilized conditions." *Yurkew*, 495 F. Supp. at 1252. "[T]attoo artists protect themselves and their clients when following safe and healthy practices," including "using sterile needles and razors, washing hands, wearing gloves, and keeping surfaces clean." Centers for Disease Control and Prevention, *supra*; *see also* Mayo Clinic, *Tattoos: Understand Risks and Precautions* (Feb. 16, 2010), *available at* http://www.mayoclinic.com/health/tattoos-and-piercings/mc00020 (last visited May 25, 2010) (providing a list of questions a person should ask "[t]o make sure [his] tattoo will be applied safely").

B.  *Tattooing Regulations*

Because of the potential health concerns implicated by tattooing, the State of California requires "[e]very person engaged in the business of tattooing . . . [to] register . . . with the county health department of the county in which that busi-

ness is conducted," CAL. HEALTH & SAFETY CODE § 119303(a), and requires these county health departments to inspect the registered tattoo parlors, *id.* § 119304. A person engaged in a tattooing business "who fails to register as provided by Section 119303 . . . [is] subject to a civil penalty of five hundred dollars ($500) per violation." *Id.* § 119306. Moreover, California makes it illegal to "tattoo[ ] or offer[ ] to tattoo a person under the age of 18 years." CAL. PENAL CODE § 653.

The City of Hermosa Beach lies within the County of Los Angeles ("the County"). According to a declaration by Claro Cartagena, an inspector of tattoo establishments for the County, there are nearly 300 tattoo establishments in the County and over 850 tattooists. However, Cartagena is the only inspector in the County monitoring the parlors. Many tattoo parlors have never been inspected and are subject to no regulations other than the requirement to register with the County. Thus, it is largely up to the owner of the tattoo establishment to sterilize his equipment and follow sterilization procedures. According to Cartagena, "While most tattoo establishments are clean and sanitary, others are not. . . . As in any field, there are those practitioners that are unscrupulous or incompetent and do not follow the proper sterilization processes strictly. This poses a risk for infection." Cartagena has also received complaints about illegal underage tattooing.

Although Los Angeles County generally permits tattooing businesses, the City of Hermosa Beach does not. Hermosa Beach Municipal Code § 17.06.070 provides: "Except as provided in this title, no building shall be erected, reconstructed or structurally altered, nor shall any building or land be used for any purpose except as hereinafter specifically provided and allowed in the same zone in which such building and land is located." The Code provides zoning for a wide variety of commercial uses, including movie theaters, restaurants, adult businesses, bars, fortune tellers, gun shops, and youth hostels. HERMOSA BEACH MUN. CODE § 17.26.030. No provision of the zoning code, however, permits tattoo parlors, and as a result,

these facilities are banned from Hermosa Beach under section 17.060.070. Indeed, on November 20, 2007, the City's Planning Commission adopted a resolution against amending the Code to permit tattoo parlors.

## C. *Facts and Procedural History*

Plaintiff-Appellant Johnny Anderson presently co-owns a tattoo parlor in the City of Los Angeles, and seeks to establish a tattoo parlor in the City of Hermosa Beach. Anderson describes his own approach to tattooing in a declaration he submitted to the district court:

> The tattoo designs that are applied by me are individual and unique creative works of visual art, designed by me in collaboration with the person who is to receive the tattoo. The precise design to be used is decided upon after discussion with the client and review of a draft of the design. The choices made by both me and by the recipient involve consideration of color, light, shape, size, placement on the body, literal meaning, symbolic meaning, historical allusion, religious import, and emotional content. I believe my designs are enormously varied and complex, and include realistic depictions of people, animals and objects, stylized depictions of the same things, religious images, fictional images, and geometric shapes and patterns. . . . Sometimes, several kinds of images are combined into a single tattoo or series of tattoos. . . . I have studied the history of tattooing, and I draw significantly on traditional Americana tattoo designs and on Japanese tattoo motifs in creating my images, while all the while trying to add my own creative input to make the designs my own.

On August 14, 2006, Anderson brought a 42 U.S.C. § 1983 action against the City in the Central District of California, alleging that Hermosa Beach Municipal Code § 17.06.070 is

facially unconstitutional under the First and Fourteenth Amendments, and seeking declaratory relief, injunctive relief, attorney's fees, costs, and any other relief the court deemed appropriate. The district court initially dismissed Anderson's claim for lack of ripeness because Anderson had not sought permission to operate a tattoo parlor under the administrative procedures provided in the Code, which allow the community development director to permit a commercial use not listed in the zoning code if this use "is similar to and not more objection[able] than other uses listed." HERMOSA BEACH MUN. CODE § 17.26.040. In May 2007, Anderson filed a request with the City's community development director seeking such a finding of "similar use" so that he could open a tattoo parlor. By a letter dated June 21, 2007, the request was denied, and therefore Anderson was prohibited from opening a tattoo parlor in the City.

On September 12, 2007, Anderson filed the instant action (similar to the first) in the Central District of California. Anderson and the City filed cross-motions for summary judgment on September 22, 2008. On October 27, 2008, the district court issued a written decision granting the City's motion for summary judgment and denying Anderson's motion. The court "conclude[d] that the act of tattooing is not protected expression under the First Amendment because, although it is non-verbal conduct expressive of an idea, it is not 'sufficiently imbued with the elements of communication' " to receive First Amendment protection under the Supreme Court's decision in *Spence v. Washington*, 418 U.S. 405, 409 (1974) (per curiam). The court reasoned that "the customer has ultimate control over which design she wants tattooed on her skin" and, therefore, "the tattoo artist does not convey an idea or message discernible to an identifiable audience." Having determined that the act of tattooing is not protected under the First Amendment, the court applied rational basis review to the City's ordinance and held that, "[g]iven the health risks

inherent in operating tattoo parlors, . . . the City has a rational basis for prohibiting tattoo parlors." Anderson timely appealed.[2]

## II.   FIRST AMENDMENT FRAMEWORK

**[1]** The First Amendment, applied to the states through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. The First Amendment clearly includes pure speech, but not everything that communicates an idea counts as "speech" for First Amendment purposes. The Supreme Court has consistently rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968) (analyzing a prosecution for the symbolic burning of a draft card to protest the draft); *see also Cohen v. California*, 403 U.S. 15, 18 (1971) (noting the important distinction between "a conviction resting solely upon 'speech' " and one based "upon . . . separately identifiable conduct which allegedly was intended . . . to be perceived by others as expressive of particular views but which, on its face, does not necessarily convey any message").

**[2]** Thus, although pure speech is entitled to First Amendment protection unless it falls within one of the "categories of speech . . . fully outside the protection of the First Amendment," *United States v. Stevens*, 130 S. Ct. 1577, 1586 (2010); *see also Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942), conduct intending to express an idea is constitutionally protected only if it is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments," which means that "[a]n intent to

---

[2]"We review de novo a grant of summary judgment and must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

convey a particularized message [is] present, and . . . the likelihood [is] great that the message w[ill] be understood by those who view[ ] it," *Spence*, 418 U.S. at 409-11. And even where conduct expressive of an idea *is* protected by the First Amendment, "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." *Texas v. Johnson*, 491 U.S. 397, 406 (1989). Restrictions on protected expressive conduct are analyzed under the four-part test announced in *O'Brien*, a less stringent test than those established for regulations of pure speech.[3]

[3] Accordingly, our analysis proceeds as follows. Our first task is to determine whether tattooing is (1) *purely expressive activity* or (2) *conduct* that merely contains an expressive component. In other words, we must determine whether tattooing is more akin to writing (an example of purely expressive activity) or burning a draft card (an example of conduct that can be used to express an idea but does not necessarily do so). *See O'Brien*, 391 U.S. at 370, 376; *Cohen*, 403 U.S. at 18. If tattooing is purely expressive activity, then it is entitled to full First Amendment protection and the City's regulation is constitutional only if it is a reasonable "time, place, or manner" restriction on protected speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).[4] If, on the

---

[3]In *O'Brien*, the Court held that a regulation of protected expressive conduct is constitutional:

> [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377.

[4]Anderson does not contend that the City's regulation is a content-based restriction on speech. And with good reason, as the City bans all tattoo parlors, not just those that convey a particular kind of message or subject matter. Thus, we do not subject the regulation to strict scrutiny.

other hand, tattooing is merely conduct with an expressive component, then it is entitled to constitutional protection only if it is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Spence*, 418 U.S. at 409. If so, then the constitutionality of the ordinance is governed by the *O'Brien* test. If tattooing is conduct that is *not* "sufficiently imbued with elements of communication," *id.*, then we must determine only whether the City's zoning regulation is rationally related to a legitimate governmental interest, *see Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981).

With this complex legal framework in mind, we turn to Hermosa Beach Municipal Code § 17.06.070.

## III.   ANALYSIS

We hold that Hermosa Beach Municipal Code § 17.06.070 is facially unconstitutional to the extent that it excludes tattoo parlors. First, we hold that tattooing is purely expressive activity rather than conduct expressive of an idea, and is thus entitled to full First Amendment protection without any need to resort to *Spence*'s "sufficiently imbued" test. Second, we hold that the City's total ban on tattooing is not a constitutional restriction on protected expression because it is not a reasonable "time, place, or manner" restriction.

### A.   *Tattooing as First Amendment Expression*

The district court assumed that the process of tattooing is at most "non-verbal conduct expressive of an idea" rather than speech itself. This determination is consistent with cases from other courts that have emphasized the distinction between the *product* and the *process* of tattooing and have held that the physical process of tattooing is conduct subject to *Spence*'s "sufficiently imbued" test. *See, e.g.*, *Hold Fast Tattoo*, 580 F. Supp. 2d at 660 (analyzing tattooing under *Spence*'s framework based on the premise that "[t]he act of

tattooing is one step removed from the actual expressive conduct"); *Yurkew*, 495 F. Supp. at 1253-54 (regardless of "whether . . . the image conveyed by the tattoo[ ] is an art form or amounts to art," "the process of tattooing is undeniably conduct" that is subject to the *Spence* test). These courts then held that tattooing fails the *Spence* test. *See, e.g.*, *Hold Fast Tattoo*, 580 F. Supp. 2d at 660 (holding that "[t]he act of tattooing . . . itself is not intended to convey a particularized message"); *Yurkew*, 495 F. Supp. at 1253-54 (holding that "the actual process of tattooing is not sufficiently communicative" to come within the First Amendment, because "there has been no showing that the normal observer . . . would regard the process of injecting dye into a person's skin through the use of needles as communicative"); *White*, 560 S.E.2d at 423 ("Unlike burning [a] flag, the process of injecting dye to create [a] tattoo is not sufficiently communicative to warrant [First Amendment] protection[ ]."). Similarly, the City argues that "[t]he process of injecting dye into a person's skin through the use of needles," in contrast with "any message conveyed by the tattoo image, is non-expressive conduct that must, in order to acquire First Amendment protection [under *Spence*], carry with it an intent to convey a message that will be understood by those who viewed it."

For the reasons set forth below, we disagree with the basic premise underlying the conclusions of both the City and the lower courts that have considered this issue. The tattoo *itself*, the *process* of tattooing, and even the *business* of tattooing are not expressive conduct but purely expressive activity fully protected by the First Amendment.

### 1.   The Tattoo

**[4]** There appears to be little dispute that the tattoo itself is pure First Amendment "speech." The Supreme Court has consistently held that "the Constitution looks beyond written or spoken words as mediums of expression." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515

U.S. 557, 569 (1995). Accordingly, the Supreme Court and our court have recognized various forms of entertainment and visual expression as purely expressive activities, including music without words, *Ward*, 491 U.S. at 790; dance, *Schad*, 452 U.S. at 65-66; topless dancing, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932-934 (1975); movies, *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952); parades with or without banners or written messages, *Hurley*, 515 U.S. at 568; and both paintings and their sale, *White v. City of Sparks*, 500 F.3d 953, 956 (9th Cir. 2007). We have afforded these expressive activities full constitutional protection without relying on the *Spence* test. *See Hurley*, 515 U.S. at 569 ("[A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollack, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." (citation omitted) (quoting *Spence*, 418 U.S. at 411)).

**[5]** Tattoos are generally composed of words, realistic or abstract images, symbols, or a combination of these, all of which are forms of pure expression that are entitled to full First Amendment protection. Tattoos can express a countless variety of messages and serve a wide variety of functions, "including: decorative; religious; magical; punitive; and as an indication of identity, status, occupation, or ownership." Mark Gustafson, *The Tattoo in the Later Roman Empire and Beyond*, *in* WRITTEN ON THE BODY: THE TATTOO IN EUROPEAN AND AMERICAN HISTORY 17 (Jane Caplan ed., Reaktion Books 2000); *see also* Alan Govenar, *The Variable Context of Chicano Tattooing*, *in* MARKS OF CIVILIZATION 209 (Arnold Rubin ed., Regents of the University of California 1988) (discussing the religious, social, and political purposes of tattooing); Clinton R. Sanders, *Drill and Frill: Client Choice, Client Typologies, and Interactional Control in Commercial Tattooing Settings*, *in* MARKS OF CIVILIZATION, *supra*, at 222-23 (discussing the "wide variety of reasons" people choose to get a tattoo, including symbolization of an interpersonal relationship,

participation in a group, representation of key interests and activities, self-identification, and making a decorative or aesthetic statement). We do not profess to understand the work of tattoo artists to the same degree as we know the finely wrought sketches of Leonardo da Vinci or Albrecht Dürer, but we can take judicial notice of the skill, artistry, and care that modern tattooists have demonstrated.

**[6]** The principal difference between a tattoo and, for example, a pen-and-ink drawing, is that a tattoo is engrafted onto a person's skin rather than drawn on paper. This distinction has no significance in terms of the constitutional protection afforded the tattoo; a form of speech does not lose First Amendment protection based on the kind of surface it is applied to. It is true that the nature of the surface to which a tattoo is applied and the procedure by which the tattoo is created implicate important health and safety concerns that may not be present in other visual arts, but this consideration is relevant to the governmental interest *potentially justifying* a restriction on protected speech, not to whether the speech is constitutionally protected. We have little difficulty recognizing that a tattoo is a form of pure expression entitled to full constitutional protection.

## 2. The Tattooing Process

Our next task is to determine whether the *process* of tattooing is purely expressive activity. We hold that it is. *Spence*'s "sufficiently imbued" test has been reserved for processes that do *not* produce pure expression but rather produce symbolic conduct that, "on its face, does not necessarily convey a message." *Cohen*, 403 U.S. at 18. Burning a flag, *see Johnson*, 491 U.S. at 411, burning a draft card, *see O'Brien*, 391 U.S. at 370, and wearing a black armband, *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969), can be done for reasons having nothing to do with any expression, and so require an interpretive step to determine the expressive elements of these processes.

**[7]** However, neither the Supreme Court nor our court has ever drawn a distinction between the process of creating a form of *pure* speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded. Although writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation. Thus, we have not drawn a hard line between the essays John Peter Zenger published and the act of setting the type. *Cf. Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582 (1983) (holding that a tax on ink and paper "burdens rights protected by the First Amendment"). The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and woodwinds. In other words, we have never seriously questioned that the processes of writing words down on paper, painting a picture, and playing an instrument are purely expressive activities entitled to full First Amendment protection.

**[8]** Tattooing is a process like writing words down or drawing a picture except that it is performed on a person's skin. As with putting a pen to paper, the process of tattooing is not intended to "symbolize" anything. Rather, the entire purpose of tattooing is to produce the tattoo, and the tattoo cannot be created without the tattooing process any more than the Declaration of Independence could have been created without a goose quill, foolscap, and ink. Thus, as with writing or painting, the tattooing process is inextricably intertwined with the purely expressive product (the tattoo), and is itself entitled to full First Amendment protection.

We are further persuaded by the fact that the process of tattooing is more akin to traditional modes of expression (like writing) than the process involved in producing a parade, which the Supreme Court has held cannot be meaningfully

separated from the parade's expressive product in terms of the constitutional protection afforded. *See Hurley*, 515 U.S. at 568 (holding that "[p]arades are . . . a form of expression, not just motion," and noting "the inherent expressiveness of marching"). Thus, we have no difficulty holding that the tattooing process is entitled to the same First Amendment protection as the process of parading.

Moreover, it makes no difference whether or not, as the district court determined, "the customer has [the] ultimate control over which design she wants tattooed on her skin." The fact that both the tattooist and the person receiving the tattoo contribute to the creative process or that the tattooist, as Anderson put it, "provide[s] a service," does not make the tattooing process any less expressive activity, because there is no dispute that the tattooist applies his creative talents as well. Under the district court's logic, the First Amendment would not protect the process of writing most newspaper articles—after all, writers of such articles are usually assigned particular stories by their editors, and the editors generally have the last word on what content will appear in the newspaper. Nor would the First Amendment protect painting by commission, such as Michelangelo's painting of the Sistine Chapel. As with all collaborative creative processes, both the tattooist and the person receiving the tattoo are engaged in expressive activity.

3. The Business of Tattooing

[9] Finally, the fact that the City's ban relates to tattooing *businesses* rather than the tattooing process itself[5] does not

---

[5]The City does not actually ban tattooing as such but simply does not permit tattoo *parlors* in its zoning regulations. In other words, so far as we can tell, the Code contains no provision that would prevent a person from performing a tattoo on a family member in his house for free. And the City's restrictions may not apply to cosmetic tattooing that may be performed in a doctor's office, clinic, or beauty parlor.

affect whether the activity regulated is protected by the First Amendment. In *City of Sparks*, we held that even "an artist's *sale* of his original artwork constitutes speech protected under the First Amendment." 500 F.3d at 954 (emphasis added). We first emphasized the inherent expressiveness of the painting itself—in particular, that a painting "conveys [the artist's] sense of form, topic, and perspective[,] . . . may express a clear social position . . . [or] the artist's vision of movement and color, . . . [and] holds potential to 'affect public attitudes' by spurring thoughtful reflection in and discussion among its viewers." *Id.* at 956 (citation omitted) (quoting *Joseph Burstyn*, 343 U.S. at 501). We then rejected "the city's argument that [plaintiff's] sale of his paintings removes them from the ambit of protected expression." *Id.*; *see also City of Lakewood v. Plain Dealer Publ'g. Co.*, 486 U.S. 750, 756 n.5 (1988) ("[T]he degree of First Amendment protection is not diminished merely because the [protected expression] is sold rather than given away."); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988) ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak.").

The Second Circuit reached a similar conclusion in *Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996), where the court held that the sale of visual artwork is expression fully protected by the First Amendment. *Id.* at 695. The court rejected the city's argument that, unlike the production of art, "the sale of art is conduct" and should therefore be subject to *Spence*'s test. *Id.* The court held that "[t]he sale of protected materials is also protected," *id.* (citing *Lakewood*, 486 U.S. at 756 n.5), reasoning that "without the money, the plaintiffs would not have engaged in the protected expressive activity," *id.* at 696.

**[10]** *City of Sparks* and *Bery* stand for the proposition that because the sale of a painting is intertwined with the process of producing the painting, the sale is entitled to full constitutional protection without any need to resort to the *Spence* test.

The same logic applies to the business of tattooing. Thus, we conclude that the business of tattooing qualifies as purely expressive activity rather than conduct with an expressive component, and is therefore entitled to full constitutional protection without any need to subject it to *Spence*'s "sufficiently imbued" test. The business is subject to reasonable time, place, or manner restrictions (as explained in the next section), but the fact that the tattoo is for sale does not deprive it of its First Amendment protection.

### B.   *The City's Ban as a Time, Place, or Manner Restriction*

Having determined that tattooing is protected by the First Amendment, our next inquiry is whether the City's total ban on tattooing is a constitutional restriction on free expression.

A regulation that restricts protected expression based on the content of the speech is constitutional only if it withstands strict scrutiny, *see United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000), meaning that it "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end," *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). However, Anderson does not contend that Hermosa Beach Municipal Code § 17.06.070 is a content-based restriction on speech. *See supra* n.4. Rather, he argues that the City's regulation is an unconstitutional restriction on a *means* of expression.

Accordingly, we must determine not whether the City's regulation survives strict scrutiny but whether the City's regulation is a reasonable "time, place, or manner" restriction on protected speech. *Ward*, 491 U.S. at 791 ("Our cases make clear . . . that . . . the government may impose reasonable restrictions on the time, place, or manner of protected speech . . . ."). This determination requires an inquiry into whether the restriction: (1) is "justified without reference to the content of the regulated speech"; (2) is "narrowly tailored to serve a significant governmental interest"; and (3) "leave[s]

open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

Before turning to this inquiry, we first emphasize that the Supreme Court "ha[s] voiced particular concern with laws that foreclose an entire medium of expression," because "the danger they pose to the freedom of speech is readily apparent —by eliminating a common means of speaking, such measures can suppress too much speech." *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994). A long line of Supreme Court cases indicates that such laws are almost *never* reasonable "time, place, or manner" restrictions. *See, e.g.*, *id.* at 54-55 (invalidating an ordinance forbidding the display of signs on private property); *Schad*, 452 U.S. at 75-76 (ban on all live entertainment); *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 145-49 (1943) (ban on door-to-door distribution of literature); *Jamison v. Texas*, 318 U.S. 413, 416 (1943) (ban on distributing handbills on the public streets); *Lovell v. City of Griffin*, 303 U.S. 444, 451-52 (1938) (ban on distribution of pamphlets within the municipality); *but see Kovacs v. Cooper*, 336 U.S. 77, 89 (1949) (upholding a ban on sound trucks).

The interplay between the Court's often rigid statements about total bans on modes of expression and its traditional "time, place, or manner" test is not entirely clear. However, we need not determine whether the City's regulation is *per se* unconstitutional as a total ban of a means of expression or whether it is subject to a particularly stringent test, because we hold that it fails under even the traditional "time, place, or manner" test. We proceed now to that test.

1.  Justified without Reference to Content

Anderson does not dispute that the City's regulation may be "justified without reference to the content of the regulated speech," *Clark*, 468 U.S. at 293. The City's regulation bans all tattoo parlors, not just those conveying a particular kind of

message or subject matter, and is purportedly justified based on health and safety concerns.

## 2. Narrowly Tailored

**[11]** A reasonable "time, place, or manner" restriction must also be "narrowly tailored to serve a significant governmental interest." *Id.* In *Ward*, the Supreme Court clarified the meaning of this requirement:

> [A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but . . . it need not be the least restrictive or least intrusive means of doing so. . . . So long as the means chosen are not *substantially broader than necessary* to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

491 U.S. at 798, 800 (emphasis added).

Anderson does not dispute that the City has a significant interest in regulating tattooing because of the health and safety concerns implicated by this process. Rather, Anderson argues that the regulation is substantially broader than necessary to achieve this interest because the interest could be achieved by regulations ensuring that tattooing is performed in a sanitary manner rather than outright prohibition of tattooing. The City disagrees, pointing out that Los Angeles County has only one health inspector for nearly 300 tattoo establishments and over 850 tattooists, and that there are no statewide regulations relating to sterilization, sanitation, and standards for tattooists. "Put simply," the City argues, "there are insufficient resources to monitor the 8[5]0 tattooists operating in Los

Angeles County, including the many who, like Plaintiff, are self-taught and operating in backrooms and basements."

**[12]** As other courts have found, "tattooing is a safe procedure if performed under appropriate sterilized conditions." *Yurkew*, 495 F. Supp. at 1252; *see also* Centers for Disease Control and Prevention, *supra*. Tattooing is now permitted (subject to regulation) in all fifty states, with Oklahoma becoming the last to lift its ban as of November 1, 2006. Janice Francis-Smith, *OK Governor Henry Signs Tattoo Legalization into Law*, OKLA. CITY J. REC. (May 11, 2006), *available at* http://findarticles.com/p/articles/mi_qn4182/is_20060511/ai_n16412421 (last visited May 30, 2010). The City has presented no evidence that tattooing in the City *could not* be regulated in such a way that addresses the City's legitimate public health concerns. Rather, it simply argues that currently, there are insufficient resources *in place* to address these concerns. But the provision *vel non* of such resources is a matter within the City's control. Without more, we cannot approve a total ban on protected First Amendment activity simply because of the government's failure to provide the resources it thinks are necessary to regulate it.

**[13]** In sum, although a total ban on tattooing might be the most convenient way of addressing the City's health concerns, the City has given us no reason to conclude that these concerns cannot be adequately addressed through regulation of tattooing rather than a total ban on tattoo parlors. Thus, particularly in light of the Supreme Court's historical "concern with laws that foreclose an entire medium of expression," *City of Ladue*, 512 U.S. at 55, we have little difficulty concluding that the City's ban is "substantially broader than necessary to achieve the [City's] interest," *Ward*, 491 U.S. at 800.

3. Alternative Channels

**[14]** Even if the City's regulation were narrowly tailored to serve its health and safety interests, a reasonable "time, place,

or manner" restriction on protected speech must also "leave open ample alternative channels for communication of the information." *Clark*, 468 U.S. at 293. The City argues that, although its regulation restricts tattooists' ability to apply images to human skin via the injection of ink, there are alternative means available for applying the exact same words, images, and symbols to skin, such as airbrushing or the use of natural henna paste to create temporary tattoos. The City also points out that the tattooist could render his designs "on a traditional canvas or other media," such as a T-shirt. In other words, the City believes that "[t]here is nothing inherently or distinctly expressive about rendering . . . designs on the skin" using the ink-injection method.

We disagree. In *City of Ladue*, the defendant city made an argument similar to the one the City makes here. The City argued that its ban on signs on private property was "a mere regulation of the time, place, or manner of speech because residents remain free to convey their desired messages by other means, such as hand-held signs, letters, handbills, flyers, telephone calls, newspaper advertisements, bumper stickers, speeches, and neighborhood or community meetings." 512 U.S. at 56 (quotation marks and emphasis omitted). The Supreme Court was

> not persuaded that adequate substitutes exist for the important medium of speech that Ladue has closed off. . . . Displaying a sign from one's own residence often *carries a message quite distinct* from placing the same sign someplace else, or conveying the same text or picture by other means. Precisely because of their location, such signs provide information about the identity of the 'speaker[,]' . . . [which] is an important component of many attempts to persuade.

*Id.* (emphasis added). The Court held the ordinance unconstitutional because the city had "completely foreclosed a venera-

ble means of communication that is both unique and important." *Id.* at 54.

**[15]** As in *City of Ladue*, the City of Hermosa Beach has "completely foreclosed a venerable means of communication that is both unique and important." *Id.* at 54. Like music, tattooing is "one of the oldest forms of human expression," *Ward*, 491 U.S. at 790, as well as one of the world's most universally practiced forms of artwork. *See* Jane Caplan, *Introduction*, *in* Written on the Body, *supra*, at xi ("Physical evidence for the practice [of tattooing] survives from the late fourth millennium BC in Europe and from about 2000 BC in Egypt, and tattooing can be found in virtually all parts of the world at some time."). And it has increased in prevalence and sophistication in recent years. *See* Juliet Fleming, *The Renaissance Tattoo*, *in* Written on the Body, *supra*, at 61 ("[F]or the last quarter-century the West has been enjoying a 'tattoo renaissance'; a movement characterized by refinements of conception . . . ; by technical developments . . . ; and by the refinement of procedure and equipment . . . ."); Susan Benson, *Inscriptions of the Self: Reflections on Tattooing and Piercing in Contemporary Euro-America*, *in* Written on the Body, *supra*, at 240 (discussing how the "tattoo community" has "bec[o]me more visible and more organized," and noting that "over the past 30 years the number of tattoo establishments has grown rapidly in absolute terms, both in Europe and America"). According to a 2006 survey by the Pew Research Center, 36 percent of people from ages 18-25, 40 percent of people from ages 26-40, and 10 percent of people from ages 41-64, had or once had at least one tattoo. The Pew Research Center for the People & the Press, *How Young People View Their Lives, Futures and Politics: A Portrait of "Generation Next"* 21 (Jan. 9, 2007), *available at* http://people-press.org/reports/pdf/300.pdf (last visited May 30, 2010).

Most importantly, a permanent tattoo "often carries a message quite distinct" from displaying the same words or picture

through some other medium, and "provide[s] information about the identity of the 'speaker.' " *City of Ladue*, 512 U.S. at 56. A tattoo suggests that the bearer of the tattoo is highly committed to the message he is displaying: by permanently engrafting a phrase or image onto his skin, the bearer of the tattoo suggests that the phrase or image is so important to him that he has chosen to display the phrase or image every day for the remainder of his life. The relative permanence of the tattoo can also make a statement of "autonomy and self-fashioning"—"of ownership over the flesh" and a "defen[se of] the embodied self against external impositions." Benson, *supra*, at 251-52 (quotation marks omitted); *see also id.* at 251 ("[T]he permanence of the tattoo establishes . . . an instantiation of the will in defiance of process and time: 'you can never get it off.' "); *id.* at 250-251 (discussing how "the idea of the permanence of the tattoo is critical" in that it is linked "to ideas of the body as property and possession . . . indeed as the *only* possession of the self in a world characterized by accelerating commodification and unpredictability"). Finally, the pain involved in producing a permanent tattoo is significant to its bearer as well: "Pain, like the tattoo itself, is something that cannot be appropriated; it is yours alone; it stands outside the system of signification and exchange that threatens the autonomy of the self." *Id.* at 251. These elements are not present—or, at least, not nearly to the same degree—in the case of a temporary tattoo, a traditional canvas, or a T-shirt. Thus, we disagree with the City that "[t]here is nothing inherently or distinctly expressive about rendering . . . designs on the skin" using the ink-injection method.

The City analogizes this case to *Kovacs*, the only case in which the Supreme Court has upheld a total ban on a medium of communication. In *Kovacs*, the Court upheld a Trenton, New Jersey, ordinance banning sound trucks—vehicles with attached sound amplifiers—on public streets. 336 U.S. at 89. The Court emphasized Trenton's interest in preventing "distractions . . . dangerous to traffic" and preserving "the quiet and tranquility" of the residential areas. *Id.* at 87. The Court

also reasoned that the fact "[t]hat more people may be more easily and cheaply reached by sound trucks . . . is not enough to call forth constitutional protection." *Id.* at 88-89. The City argues that tattooing is just like a sound truck—it might be a more effective means to disseminate a message to the public, but the same message may be transmitted by other means. *Cf. Hold Fast Tattoo*, 580 F. Supp. 2d at 660 ("The act of tattooing is one step removed from actual expressive conduct, which is similar to a sound truck, which enables each customer to express a particularized message, but the sound truck vehicle itself is not expressive.").

The analogy to sound trucks is flawed. As discussed above, a tattoo is not merely a "more effective" means of communicating a message; rather, the tattoo "often carries a message quite *distinct*" from other media. *City of Ladue*, 512 U.S. at 56 (emphasis added). In light of the long line of cases in which the Supreme Court has invalidated total bans on a medium of communication, it cannot be true that any medium of communication may be banned based on the reasoning that it is merely a "more effective" means of communicating a message; by this logic, after all, a canvas could be considered merely a "more effective" means of displaying a painting than lined paper. Seeming to recognize that its reasoning was in some tension with its earlier cases, the *Kovacs* Court explained that its judgment also rested on the fact that no one within range of the sound truck could avoid the broadcast:

> While this Court . . . has invalidated an ordinance forbidding a distributor of pamphlets or handbills from summoning householders to their doors to receive the distributor's writings, this was on the ground that the home owner could protect himself from such intrusion by an appropriate sign that he is unwilling to be disturbed. . . . The unwilling listener is not like the passer-by who may be offered a pamphlet in the street but cannot be made to take it. In his home or on the street he is practically helpless to

> escape this interference with his privacy by loud speakers except through the protection of the municipality.

*Kovacs*, 336 U.S. at 86-87 (quotation marks and footnote omitted) (citing *Martin*, 319 U.S. at 143, 148).

**[16]** In this sense, the case at hand is easily distinguishable from *Kovacs* and indistinguishable from the Court's other cases involving total bans on modes of expression. A tattoo does not force "unwilling listener[s]" to heed its message any more than the expletive-laden jacket at issue in *Cohen*. A tattoo is displayed passively on the person's body, such that a member of the general public can simply avert his eyes if he does not wish to view the tattoo (assuming the tattoo is visible to the public at all). In other words, a tattoo effects no additional intrusion of privacy on members of the public beyond other types of expression clearly protected by the First Amendment. Thus, the City's tattoo regulation is subject to the principle in *Martin*, *Schad*, and *City of Ladue*, which, read alongside *Kovacs*, indicate that if a unique and important mode of expression does not force unwilling listeners to heed its message in an intrusive manner, the government may not ban it regardless of the availability of alternative (and less distinctive) means of communicating a similar message.

## IV.   CONCLUSION

**[17]** In sum, we hold that the tattoo itself, the process of tattooing, and the business of tattooing are forms of pure expression fully protected by the First Amendment. We further hold that the City's total ban on tattoo parlors in Hermosa Beach is not a reasonable "time, place, or manner" restriction because it is substantially broader than necessary to achieve the City's significant health and safety interests and because it entirely forecloses a unique and important method of expression. Moreover, no genuine issue of material fact exists with respect to the constitutionality of the regulation. Thus,

we hold that Hermosa Beach Municipal Code § 17.06.070 is facially unconstitutional to the extent that it excludes tattoo parlors, and we reverse the district court's order granting summary judgment in favor of the City and remand with instructions to grant Anderson's motion for summary judgment and enjoin the City to include tattoo parlors in its zoning regulations.

REVERSED.

---

NOONAN, Circuit Judge, concurring:

I concur in the holding of the court, and I agree with Judge Bybee's robust defense of the values protected by the First Amendment.

I write to state that tattooing may be purely expressive, not that it always is. Any text may be expressive but is not invariably so. A laundry list is normally not protected by the First Amendment, but William Carlos Williams made a grocery list into a poem. Context is all. A tattoo punitively affixed is unprotected.

Accepting the fact that a tattoo may qualify as protected speech, I note that creation of a tattoo may involve danger to the health of its recipient, so that tattooing requires regulation for health different from regulation, say, of a press. Tattooing as a business may also require regulation to assure that it does not attract minors. Finally, while we are bound to protect the First Amendment value at issue, we are not bound to recognize any special aesthetic, literary, or political value in the tattooist's toil and trade.